UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT PIKEVILLE

Eastern District of Kentucky
FILED
MAR 30 2004
AT COVINGTON
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

CIVIL ACTION NO. 03-270-DLB

TERESA SEXTON                                                                                   PLAINTIFF

vs.                                          **MEMORANDUM OPINION & ORDER**

AMERICAN ELECTRIC POWER SERVICE CORP.                            DEFENDANT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This is an action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), for a denial of benefits. Pursuant to the Court's order, the parties have filed cross-motions for summary judgment with supporting memoranda. (Docs. # 14, 15, 16, 17)[1] Both parties have filed Responses to the respective motions (Docs. #18,19), as well as Replies. (Doc. 22, 27, 28, 29)

I.     **FACTUAL BACKGROUND**

Plaintiff Teresa Sexton is a former employee of Kentucky Power Company, which is an affiliate of Defendant American Electric Power Service Corporation ("AEP").

The parties do not dispute that Sexton was an eligible employee under the American Electric Power System Long-Term Disability Plan. However, the parties are in dispute as to which long-term disability plan governs Sexton's claim for benefits.

When Sexton initially became eligible for benefits, AEP was the plan sponsor and

---

[1] Defendant's motion is styled "Motion for Entry of Judgment" based on the concurring opinion in *Wilikins v. Baptist Healthcare*, 150 F.3d 609, 619 (6th Cir. 1998) (stating that the "concept of summary judgement is inapposite to the adjudication of an ERISA action.")

the plan was insured by Aetna Life Insurance Company. (See Doc. # 12, Admin. Record at 219, 202) The plan is dated January 1, 1990 (hereinafter the "1990 Plan"). The insurance policy for the 1990 Plan provides:

> For the purpose of section 503 of Title 1 of the Employee Retirement Income and Security Act of 1974, as amended (ERISA), Aetna is a fiduciary with complete authority to review all denied claims for benefits under this policy .. In exercising such fiduciary responsibility, Aetna shall have discretionary authority to:
>
> determine whether and to what extent employees and beneficiaries are entitled to benefits; and
>
> construe any disputed or doubtful terms of this policy.
>
> Aetna shall be deemed to have properly exercised such authority unless Aetna abuses its discretion by acting arbitrarily and capriciously.

(Id. at 213) Under the 1990 Plan, disability was defined in the following manner:

> You will be eligible for monthly LTD benefits if you are considered to be *totally disabled.* During the first 24 months of a period of disability, you are totally disabled if you are unable to work at your own occupation solely because of sickness or injury. After the initial 24-month period of the same disability, you will be considered totally disabled if you are unable to work at any gainful occupation for which you may be able, or may reasonably become qualified by education, training, or experience to perform.

(Id. at 196) (emphasis in original).

When Sexton's benefits were denied, AEP's long-term disability plan was no longer insured by Aetna, but was a self-insured plan. (Doc. #17, Ex. A at 32)[2] AEP was still the plan sponsor, but AEP had also become the plan's administrator. According to AEP, this plan was issued in 2001 (hereinafter the "2001 Plan"). The 2001 Plan provides:

> The plan administrator has the authority to control, administer and manage

---

[2]AEP has only attached portions of what appears to be the Summary Plan Description for the 2001 Plan to its Motion.

2

> the operation of all plans. The rights to carry out responsibilities and use maximum discretionary authority permitted by law are assigned to the plan administrator and any representative it chooses for self-insured plans, and to the claims administrator for insured plans. These rights and responsibilities include the following:
> interpret, construe and administer the plans,
>
> - Make determinations regarding plan participation, enrollment and eligibility for benefits,
> - Evaluate and determine the validity of benefit claims, and
> - Resolve any and all claims and disputes regarding the rights and entitlements of individuals to participate in the plans and to receive benefits and payments pursuant to the plans.
>
> The decisions of these parties are final and binding.

(Id. at 31) Under the 2001 Plan, claims were to be handled by the Appeal Committee.[3]

Disability was defined as follows:

> You must meet the plan's definition of disability to receive LTD benefits. If you are unable to perform the duties of **your** job, you are eligible for benefits for up to 24 months from the date of your disability. Then, if you are unable to perform the duties of **any** job for which you are reasonably qualified due to education, training and experience, you may receive benefits up to the maximum benefit period.

(Id. at 158) (emphasis in original).

Sexton was formerly employed by AEP as a Station Mechanic. (Admin. Record at 122) The requirements for this position place it in the heavy work category. (See id. at 125, 162) In 1994, Sexton injured her back and head in an accident at work. (Id. at 122, 127) In March of 1996, Aetna approved Sexton for long-term disability benefits based on her inability to perform her usual job. (Id. at 127) Sexton was also awarded disability benefits by the Social Security Administration. (Id. at 109)

---

[3]This is the explanation AEP provides in its briefs. The SPD in effect when Sexton's benefits were denied states: "The AEP Long-Term Disability (LTD) Plan is administered through Kemper National Services (Kemper)." (Doc. #17, Ex A)

3

The Administrative Record shows that on January 11, 1995, Dr. Phillip Tibbs, a neurosurgeon, examined Sexton and reviewed a lumbar and thoracic MRI scan, as well as a lumbar CAT scan. (Id. at 138) Dr. Tibbs found the MRI and CAT scan to be normal, and opined that Sexton could return to work. (Id.) On January 16, 1995, Dr. Jeff Prater examined Sexton and reviewed a X-ray and a MRI scan. (Id. at 124) Dr. Prater stated that Sexton was not able to do her normal job, but "could be a candidate for light duty type exercise such as answering telephone." (Id.) On November 29, 1995, Dr. Mark Dubick examined Sexton and concluded that she was capable of performing "clerical/administrative (sedentary) activity." (Id. at 146) On August 26, 1996, Dr. Prater found Sexton to have a moderate limitation of functional capacity, which would permit her to perform clerical/administrative activity. (Id. at 141) In September of 1997, June of 1999, and April of 2000, Dr. William Collins completed an Attending Physician's Statement form. (Id. at 54, 56, 60) On all three occasions, Dr. Collins stated that Sexton had a severe limitation of functional capacity, and was "incapable of minimal (sedentary) activity." (Id. at 55, 57, 61) The Administrative Record also includes treatment records from Dr. Joseph Dimino, Sexton's chiropractor. (Id. at 78-89)

In a letter dated May 8, 2001, Sexton was informed that Acordia Employers Service was conducting an annual review. (Id. at 165) Acordia identified itself as the third-party administrator of the plan. (Id.) Acordia requested that Sexton provide them with a list of all her attending physicians and a signed release so that they could contact her physicians for medical information. (Id.)

On October 9, 2001, Sexton underwent knee surgery. (Id. at 149) The Record indicates that Sexton may have also had ACL Reconstruction surgery in March of 2002,

4

but there is no records from this surgery. (Id. at 26)

On July 17, 2002, Dr. Collins completed a fourth Attending Physician's Statement form. (Id. at 50) Dr. Collins again stated that Sexton was under a severe limitation, and was "incapable of minimal (sedentary) activity." (Id. at 51)

On October 16, 2002, an investigation and surveillance service performed surveillance on Sexton's home. (Id. at 34) The surveillance did not uncover any information because Sexton was not at home that day. (Id.)

On November 5, 2002, Philip Bentley, PT, OCS, performed a Functional Capacity Evaluation (FCE) of Sexton. (Id. at 26) Based on his physical exam of Sexton, Bentley recommended that Sexton not return to her prior job, but showed the capacity for light level work. (Id. at 28, 33)[4]

On November 20, 2002, Dr. Mark Moyer, an independent physician, reviewed Sexton's records. (Id. at 22) Dr. Moyer concluded that Sexton was able to perform at the light work level. (Id. at 24)

On February 20, 2003, Anthony Stead performed an employability assessment based on Sexton's previous work history and current physical capabilities. (Id. at 17, 20) Relying on the FCE by Bentley, Stead assumed that Sexton was capable of light work, and then compiled a list of jobs which would be available to Sexton based on her transferable skills and the labor force statistics for her area. (Id. at 18)

---

[4] AEP repeatedly states that Bentley concluded that Sexton could perform light work. This specific statement does not appear in the report. However, based on the functional capacities listed in Bentley's report, Sexton would be able to perform light work, which generally involves lifting no more than 20 pounds; frequent lifting or carrying of objects weighing up to 10 pounds; a good deal of walking or standing; or sitting most of the time with some pushing and pulling of arm or leg controls.

5

By letter dated April 25, 2003, Acordia informed Sexton that she no longer qualified for benefits because she was not disabled from "any occupation." (Id. at 14) Acordia relied on the following information: (1) the November 5, 2002 FCE performed by Philip Bentley; (2) Dr. Moyer's review of Sexton's medical history and conclusion that the ability to perform light work was supported; and (3) the February 20, 2003 employability assessment by Anthony Stead which concluded that realistic occupational options were available to Sexton, including claims clerk, dispatcher, meter reader, mail clerk, order filler, shipping order clerk, and salesperson. (Id.) Acordia informed Sexton she could appeal the decision to terminate her benefits to AEP, as plan sponsor.

Sexton appealed. (Id. at 10) Sexton's appeal was handled by the Appeal Committee. (Id. at 12) The Appeal Committee submitted Sexton's records for a review by Dr. Leela Rangaswamy, an independent orthopaedic surgeon. (Id. at 6) Dr. Rangaswamy concluded that Sexton was not considered to be totally disabled from any occupation for which she is reasonably qualified by training, education or background. (Id.) Dr. Rangaswamy relied on the normal results of the MRI and CT scan; Dr. Tibbs' evaluation; and Dr. Prater's lack of objective clinical findings. (Id.) Dr. Rangaswamy noted that there were no records regarding the ACL reconstruction. (Id.) However, Dr. Rangaswamy also concluded that the FCE done by Philip Bentley in November of 2002 was not valid or reliable because the conclusions were based on manual muscle testing, which cannot be quantified. (Id.)

The Appeal Committee upheld the decision to terminate benefits. (Id. at 3) The Appeal Committee explained that its determination was based on Sexton's entire case file as well as the record review by Dr. Rangaswamy. (Id.) The Appeal Committee stated that

Sexton's file indicated that she is able to perform a light duty occupation, and therefore she was not disabled. (Id.)

## II. ARGUMENTS OF THE PARTIES

### A. Plaintiff[5]

Sexton argues that the Court's review of AEP's decision should be *de novo* because there is no clear grant of discretion from AEP to Acordia, the claims administrator. Sexton also argues that there was no grant of discretion to the Appeals Committee, which made the final decision to terminate her benefits.

However, Sexton argues that even under the arbitrary and capricious standard, the evidence shows that the decision to terminate benefits was wrongful because she is essentially in the same physical and emotional condition today as when her LTD benefits were approved in 1996. Sexton points to the records of Dr. Dimino, her chiropractor; her knee surgery in 2001; the opinion of Dr. Collins that she was too incapacitated to return to work at any level; and Dr. Prater, who kept her out of work as a result of her injuries.

### B. Defendant

AEP argues that the arbitrary and capricious standard of review applies based on the language in either the previous or current version of the plan. However, AEP cites to decisions from other circuits which have held that since the plaintiff's claim did not accrue

---

[5]Plaintiff's counsel also makes a number of extraneous arguments which will not be addressed: (1) AEP's citation of an unpublished opinion should be stricken or disregarded for violating Sixth Circuit Local Rule 28(g); (2) AEP filed a Motion for Entry of Judgment, which was improper based on the Court's order for the parties to file simultaneous motions for summary judgment; (3) AEP attached portions of the 2001 Plan documents as Appendix A to its motion, and this material is outside the "Administrative Record." In addition, there is an argument for costs and attorney fees in the motion. (Doc. #14)

7

until benefits were terminated, the version of the plan that existed at the time of termination was controlling. In addition, AEP points out that while Acordia, its third-party administrator, made the initial decision to terminate benefits, it was the Appeals Committee which made the final decision, and is the decision before this Court.

AEP cites the following evidence to support the decision to terminate benefits: the peer review analysis by Dr. Rangaswamy which concluded that Sexton is not disabled under the "any occupation" standard; the employability assessment that identifies numerous jobs which are within Sexton's physical limitations; the evaluation by Dr. Moyer which concludes that Sexton is able to perform light-duty work; the FCE by Philip Bentley which concluded that Sexton is able to perform sedentary and/or light duty work; the normal MRI and CT scan results of Sexton's lumbar spine and head; the conclusion of Dr. Tibb, a neurosurgeon, that Sexton is able to return to work; Dr. Dubick's statement that Sexton is capable of performing clerical/administrative functions at a sedentary level; and Dr. Prater's statements that Sexton's physical impairment is only "moderate" and she is capable of performing clerical/administrative activity that is sedentary, and that Sexton is a candidate for light duty exercise.

AEP points out that the mere fact of conflicting evidence, such as the opinion of Sexton's treating physician, Dr. Collins, that Sexton cannot work at all does not indicate that the decision to terminate benefits was arbitrary and capricious.

### III. ANALYSIS

#### A. Standard of Review

The Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the

8

administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "Where an ERISA plan gives the plan administrator discretionary authority to determine benefits or construe terms of the plan, the administrator's interpretation of the Plan language is reviewed under an 'arbitrary and capricious' standard." *Wendy's International, Inc. v. Karsko*, 94 F.3d 1010, 1012 (6th Cir. 1996), *citing, Firestone Tire*, 489 U.S. at 111. The Sixth Circuit has consistently required that the plan "contain a clear grant of discretion." *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998), *cert. denied*, 531 U.S. 814 (2000).

Here, there are two plans, the 1990 Plan which was in effect when Sexton was granted benefits, and the 2001 Plan, which was in effect when Sexton's benefits were terminated.

Citing *Hackett v. Xerox Corporation Long-Term Disability Income Plan*, 315 F.3d 771 (7th Cir. 2003), AEP argues that the 2001 Plan controls. In *Hackett*, the plaintiff was first granted benefits in 1987, and continued to receive benefits until 1999. *Id.* at 773. In the interim, Xerox adopted a new long-term disability plan. *Id.* In determining which plan controlled, the court noted that under Seventh Circuit precedent, there was a presumption against the vesting of benefits unless the language in the plan establishes some ambiguity on the issue. *Id.* at 774. The court then stated that:

> The fact that benefits have not vested suggests that the plan is malleable and the employer is at liberty to change the plan and thus change the benefits to which a participant is entitled. Since the employer can change the plan, then it must follow that the controlling plan will be the plan that is in effect at the time a claim for benefits accrues.

*Id.* Based on this reasoning, the court held that absent any language suggesting ambiguity regarding vesting, the controlling plan was the plan in effect at the time the benefits were denied. *Id.* Other courts have held similarly. *Grosz-Salomon v. Paul Revere Life Insurance Co.*, 237 F.3d 1154, 1159 (9th Cir.2001) (as a matter of first impression, holding that the revised plan in effect when the plaintiff's cause of action accrued was controlling); *Smathers v. Multi-Tool, Inc/Multi-Plastics, Inc. Employee Health and Welfare Plan*, 298 F.3d 191, 196-97 (3rd Cir. 2002) (adopting the approach from the Ninth Circuit in *Grosz-Salomon* of looking at the plan in effect on the date the administrator actually made the benefits determination).

While the Sixth Circuit has yet to address this issue, related decisions indicate that the Sixth Circuit would follow the approach taken by the Seventh, Ninth, and Third Circuits. First, the Sixth Circuit has held that "[e]mployers are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Sprague v. General Motors Corp.*, 133 F.3d 388, 400 (6th Cir.) (en banc), *cert. denied*, 524 U.S. 923 (1998). In addition, the court has held that "[a]n ERISA cause of action for benefits under ERISA does not arise until a claim for benefits has been made and formally denied." *Stevens v. Employer-Teamsters Joint Council No. 84 Pension Fund*, 979 F.2d 444, 451 (6th Cir. 1992). Based on the foregoing, logic dictates that the Sixth Circuit would hold that the controlling plan is that which was in effect when the benefits were denied.

Looking at the language of the 2001 Plan, the plan administrator has the discretion to determine eligibility for benefits and construe the terms of the plan. Therefore, it is clear

10

that the arbitrary and capricious standard of review applies.[6]

However, where a plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, the conflict must be weighed as a factor in determining whether the decision was arbitrary and capricious. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

Here, the Plan is both funded and administered by AEP. "Accordingly, it incurs a direct expense as a result of the allowance of benefits, and it benefits directly from the denial or discontinuation of benefits." *Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514, 521 (6th Cir. 1998). Therefore, "there is an actual, readily apparent conflict here, not a mere potential for one." *Id.* However, "the conflict of interest inherent in self-funded plans does not alter the standard of review, but 'should be taken into account as a factor in determining whether the . . . decision was arbitrary and capricious.' " *Peruzzi v. Summa Medical Plan*, 137 F.3d 431, 433 (6th Cir. 1998), *quoting, Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d 689, 694 (6th Cir.1989). Therefore, this conflict is a factor in determining whether AEP's decision to deny benefits was arbitrary and capricious. *Accord Napier v. Hartford Life Ins. Co.*, 282 F.Supp.2d 531, 539 (E.D.Ky. 2003), *citing, Killian*, 152 F.3d at 521.

---

[6]In the event that the Sixth Circuit would not hold as predicted, and the 1990 Plan is controlling, the arbitrary and capricious standard is still applicable. The 1990 Plan states that Aetna, as a fiduciary, has the discretionary authority to determine entitlement to benefits and construe terms of the policy. Moreover, when presented with this very plan language, other district courts have held that the arbitrary and capricious standard of review applies. *See Best v. Nissan Motor Corp.*, 973 F.Supp. 770 (M.D. Tenn. 1997); *Turay v. Aetna U.S. Healthcare*, 160 F.Supp.2d 557 (S.D.N.Y. 2001); *Jones v. Aetna U.S. Helathcare*, 136 F.Supp.2d 112 (C.D. Cal. 2001).

## B. The decision to terminate benefits was not arbitrary and capricious.

When applying this deferential standard, this Court must decide whether the decision to deny benefits was "rational in light of the plan's provisions." *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir.), *cert. denied*, 488 U.S. 826 (1988). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis*, 887 F.2d at 693.

The letter denying benefits explained:

> The Appeal Committee based its determination on a review of your entire case file (documentation accumulated by Acordia as well as any additional medical information that you provided with your appeal letter). In addition, the Appeal Committee utilized an external review organization for assistance in evaluating your condition.
>
> Based upon its review, the Appeal Committee determined that insufficient objective findings were presented to support a conclusion that you have a functional impairment which precludes you from performing the essential duties of any occupation for which you are qualified by your training, education, or experience. The file indicates you have been found able to perform a light duty occupation that you no longer meet the Plan's definition of "disability" as stated above. We therefore uphold Acordia's decision to terminate your LTD benefits.

(Admin. Record at 3)

Sexton argues that this decision was not rational based on the records of her treating chiropractor, Dr. Dimino, as well as the opinion of Dr. Collins, her treating physician, that she was too incapacitated to return to work at any level. In *Black & Decker Disability Plan v. Nord*, 123 S.Ct. 1965 (2003), the Supreme Court held that ERISA plan administrators are not required to give special deference to the opinions of treating

12

physicians. *Id.* at 1972.[7] The Court held that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* Therefore, AEP was not required to adopt the opinions of Sexton's treating physicians, and was free to credit other reliable evidence in the record.

Sexton also points out that the Social Security Administration determined that she was disabled. In *Darland v. Fortis Benefits Inc. Co.*, 317 F.3d 516 (6th Cir. 2003), the Sixth Circuit found that it was inconsistent for an insurer or administrator to request that a claimant apply for Social Security disability benefits so as to reduce the amount of monthly disability payments that it paid, and then ignore the SSA's determination. *Id.* at 530. However, in a subsequent unpublished opinion, the court had the following to say about the applicability of this decision:

> Prior to this court's opinion in *Darland*, unpublished opinions in this circuit stated that an administrator of an ERISA plan was not bound by a disability determination made by the SSA. *See e.g., Fuller v. Retirement Plan for Salaried Employees of Brown & Williamson Tobacco Corp.*, No. 96-5191, 1997 WL 10952, 1997 U.S.App. LEXIS 717 (6th Cir. Jan. 10, 1997) (unpublished). However, this court in *Darland* recognized a situation in which the SSA determination on benefits should carry significant weight: The panel found that it was inconsistent for a plan administrator to "ignore the Social Security Administration's determination" that the plaintiff was disabled when the administrator had requested that the plaintiff "apply for Social Security disability benefits so as to reduce the amount of monthly disability payments." *Darland*, 317 F.3d at 530. The court found that the principles of judicial estoppel, "[t]hough not directly applicable in [that] case," weighed

---

[7]This decision impliedly overruled the Sixth Circuit's decision in *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516, 532 (6th Cir. 2003), which held that "the treating physician rule should apply in ERISA cases, requiring courts to defer to the opinions of a claimant's treating physician unless there is substantial evidence contradicting them."

13

against the administrator's being permitted to take such inconsistent positions. *Id.*

The court in *Darland* relied upon a Seventh Circuit case, *Ladd v. ITT Corp.*, 148 F.3d 753 (7th Cir.1998), for the proposition that the judicial estoppel concept can apply in a case where a plan administrator helps an employee gain Social Security benefits (including hiring legal counsel for the employee in hopes of securing Social Security benefits), but then attempts to deny disability benefits under an ERISA plan for the same impairment. . . .

. . . Unlike *Ladd* and *Darland*, this is not a case in which there is evidence that the plan administrator urged or aided the claimant in his pursuit of Social Security benefits. And it is important to note that the decision in *Darland* was clearly based upon the application of the treating physician rule, and, in the alternative, upon the "substantial evidence" showing that the defendant's denial of benefits was arbitrary and capricious. *See Darland*, 317 F.3d at 533. Accordingly, we do not feel the dicta in *Darland* regarding the weight to be afforded to the SSA's determination of disability is controlling in this case.[8]

*Hurse v. Hartford Life and Accident Insurance Co.*, No. 02-5496, 2003 WL 22233532, *5 (6th Cir. Sept. 26, 2003) (unpublished). Here, there is no evidence in the record that AEP helped Sexton apply for SSA benefits by hiring legal counsel or otherwise.[9] The 1990

---

[8]The court explained that the Supreme Court's decision in *Black & Decker* was useful in examining this issue:

To begin with, it would be incongruous to hold that, although the "treating physician rule" is not applicable in ERISA cases, the ERISA plan administrator is bound by the disability determination of the SSA, which is required to apply that rule. That aside, the Supreme Court's reasoning in concluding that ERISA did not require special deference to a treating physician stressed the differences between the Social Security disability program and ERISA benefit plans.

2003 WL 22233532 at *6.

[9]In the March 4, 1996 letter granting benefits, Aetna informed Sexton:

During the period of benefit eligibility, you may be contacted by our representatives regarding Aetna's rehabilitation program or our Social Security Advocacy Attorney Referral Program. While these programs are

14

Plan, which was in effect when Sexton applied for benefits, states:

> In order to be considered for LTD benefits, you must advise the insurance company of the amount of other income payable. Also, you must submit evidence satisfactory to the insurance company that you have made proper application for all other income payable due to disability.

(Admin. Record at 198) While this language above can be read as to urge claimants to apply for SSA benefits, the failure to apply is not listed as grounds for the termination of benefits. (Id. at 199) Therefore, this does not appear to be a situation where the principals of judicial estoppel are applicable, and this Court will not apply the *Darland* decision to this case.[10]

Sexton also argues that the evidence shows that the decision to terminate benefits was wrongful because she is essentially in the same physical and emotional condition today as when her LTD benefits were approved in 1996. However, when Sexton's benefits

---

voluntary, we encourage you to cooperate when requested since these services may be highly beneficial to you.

(Admin. Record at 127) There is no indication that Sexton participated in the Advocacy Attorney Referral Program, but she was represented by counsel at the SSA hearing. (Id. at 109) However, even if this attorney came from the "referral program," Sexton's participation was voluntary, and there is no indication that Aetna or AEP paid for this attorney's services.

[10]Moreover, before *Darland*, this Court held that:

> [The plaintiff's] argument that he should be entitled to receive benefits because he was awarded Social Security benefits is not persuasive because the ALJ's decision is not dispositive. See *Cox v. Mid-America Dairymen, Inc.*, 965 F.2d 569 (8th Cir.1992); *Madden v. ITT Long Term Disability Plan*, 914 F.2d 1279 (9th Cir.1990), cert. denied, 498 U.S. 1087, 111 S.Ct. 964, 112 L.Ed.2d 1051 (1991). The Committee could have properly denied [the plaintiff's] appeal regardless of the Social Security Administration's decision as long as the denial was not arbitrary or capricious.

*Dials v. SMC Coal & Terminal Co.*, 891 F.Supp. 373, 377 (E.D.Ky.,1995).

15

were initially granted in 1996, that disability determination was based on the "own occupation" standard. While there appears to be no dispute that at that time Sexton was incapable of performing her job as a station mechanic, there is evidence in the record that Sexton could have performed other work. On January 11, 1995, Dr. Tibbs, examined Sexton and reviewed MRI and CAT scans, and concluded that Sexton could return to work. On January 16, 1995, Dr. Prater stated that Sexton "could be a candidate for light duty type exercise such as answering telephone." On November 29, 1995, Dr. Dubick concluded that Sexton was capable of performing "clerical/administrative (sedentary) activity." On August 26, 1996, Dr. Prater stated Sexton had a moderate limitation of functional capacity, which would permit her to perform clerical/administrative activity.

After twenty-four months, Sexton's disability determination was based on a different disability standard. When the decision to terminate Sexton's benefits was made in 2003, the 2001 Plan was in effect, which defined disability as "unable to perform the duties of any job for which you are reasonably qualified due to education, training and experience." Therefore, while Sexton may be in the same physical and emotional condition today as when her LTD benefits were approved in 1996, the definition for disability changed.

One final matter deserves the Court's attention. From 1998, when the "any job" standard became applicable, until about 2001, when Acordia conducted its annual review of Sexton's case, the only evidence of disability entered into the record are the Attending Physician Statements from Dr. Collins. These forms are dated June of 1999 and April of 2000. Both of these forms state that Sexton is "incapable of minimal (sedentary) activity." Apparently, Aetna, and later AEP, found this evidence to be satisfactory evidence of Sexton's disability under the "any job" standard, despite the evidence cited above from Drs.

16

Tibbs, Dubick and Prater that Sexton could return to some level of work. It was not until Acordia began the annual review in 2001 that more evidence was required, including medical records from Sexton's treating physicians. While this approach may seem somewhat inconsistent, and may have lulled Sexton into believing that her benefits would continue, it does not mean that the decision to terminate benefits was arbitrary and capricious. Under the Plan, Sexton had the burden to prove her continued disability by providing "written satisfactory proof of disability." As along as AEP can "offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious."

AEP has met that burden. Based on the evidence in the record that Sexton was capable of performing work at a light level, Sexton was no longer eligible for benefits because she no longer met the definition of disability under the plan.

Therefore, for the reasons stated herein,

**IT IS ORDERED as follows:**

(1)   Plaintiff's Motion for Summary Judgment (Doc. #14) be, and is hereby **DENIED**;

(2)   Defendant's Motion for Entry of Judgment (Doc. #16) be, and is hereby **GRANTED**;

(3)   Plaintiff's complaint be, and is hereby, **DISMISSED WITH PREJUDICE** and **STRICKEN** from the docket of this Court.

(4)   This is a final and appealable order.

This 30th day of March, 2004.



Signed By:
David L. Bunning
United States District Judge

G:\DATA\Opinions\7-03-270.MOO-3-30.wpd

18